LUTHER E. HALL, Judge pro tem.
Plaintiff, Mrs. Ida Tribou, widow of Louis Tribou, sustained personal injuries while riding as a passenger on a New Orleans Public Service Bus, when the bus and a vegetable truck belonging to Royal Gray, and driven by his brother, Ernest Gray, came into collision on a street in downtown New Orleans.
Plaintiff sued New Orleans Public Service Inc.; Ernest Gray; Royal Gray; Armand Montz and his liability insurer, Massachusetts Bonding and Insurance Company.
Armand Montz and his insurer were made parties defendant on the theory and allegation that the two Gray brothers and Armand Montz were engaged in a joint enterprise for the purpose of selling vegetables at the French Market and that the accident occurred while the vegetable truck was being operated on the business of the joint adventure. In the alternative, plaintiff alleged that Ernest Gray was an employee of Armand Montz engaged in the course and scope of his employment.
The case was tried to a jury and resulted in a verdict for the plaintiff against Royal Gray, Armand Montz and Massachusetts Bonding and Insurance Company in solido for $5,661.55 plus legal interest and costs, and for the defendant New Orleans Public Service Inc., dismissing plaintiff’s suit as to the latter.
Armand Montz and Massachusetts Bonding and Insurance Company have appealed suspensively and devolutively to this court. The plaintiff has answered the appeal praying that the judgment as to them be increased to $15,661.55, but otherwise acquiescing in the judgment.
It is conceded that the accident was due entirely to the fault and negligence of Ernest Gray, the driver of the vegetable truck.
The questions presented for decision here .are whether the relations between Ernest Gray and Armand Montz were such that Armand Montz must respond in damages for Ernest Gray’s negligence, and, if so, whether the judgment should be increased.
As noted above plaintiff takes the position that Ernest Gray and Montz were joint adventurers or partners, or alternatively that they occupied an employee-employer relationship. Defendants contend on the other hand that Ernest Gray was an independent contractor.
The record shows that Armand Montz operates a truck farm at Laplace, Louisiana, and operates in connection therewith a warehouse, a packing plant and an ice-house. He raises vegetables, picks and packs them, freezes them and stores them in his warehouse to be sold to retailers. He maintains a fleet of trucks solely for the purpose of handling the delivery of his frozen vegetables. He usually grows more vegetables on his farm than he can pack and freeze. He picks only what he can pack and freeze. The vegetables that he does not harvest will rot in the ground unless he can dispose of them in some way.
Ernest Gray and Montz had an arrangement relative to some of this surplus crop. The determination of just what this arrangement was constitutes the crux of this case. The record is clear that Ernest Gray, and helpers hired and paid by him, went onto the farm and picked and bunched surplus vegetables, washed them at the Montz wash-shed, iced them at the Montz ice-house and loaded them onto a truck which Ernest Gray borrowed from his brother, Royal Gray. Thereafter, Ernest brought them to New Orleans and sold them. It was on one of these trips that the accident with the bus occurred.
The jury had to determine from the evidence adduced whether, at the time Gray left the farm with his truckload, he was operating for his own account with produce bought outright from Montz, as Montz says, or whether as is contended by plaintiff, he was an employee of Montz or occupied the position of co-adventurer or *280 partner with Montz quo ad the sale of the produce.
The only possible method by which Montz and his insurer could be held liable would be on the basis of a relationship between Ernest Gray and Montz constituting employer-employee, partnership, or joint venture.
There is nothing in the record indicating an employer-employee relationship. Plaintiff’s whole effort was to show a “split-profit” arrangement between Ernest Gray and Montz.
The primary question of fact which the jury had to resolve was whether such an arrangement existed.
Only two witnesses knew anything whatever about the arrangement — Montz and Ernest Gray.
Montz testified that their relationship was purely that of vendor and vendee; that he and Gray agreed on a price per dozen bunches before the vegetables were ever picked; that Gray and helpers employed and paid by Gray then gathered them from the field, washed them at the Montz wash-shed, packed them and iced them at the Montz ice-house and loaded them onto the truck. He testified that in addition to the agreed unit price per dozen bunches, Gray paid him a flat fee for the use of his washing facilities and paid for the ice he used. He further testified that after the truck was loaded, the vegetables belonged to Ernest Gray by right of purchase and that he had nothing whatever to do with Gray’s operations. Montz’s testimony was clear and unequivocal,
Ernest Gray was first called to the stand as under cross-examination by plaintiff’s attorney. After first relating that he and helpers employed and paid by him picked and bunched the vegetables in the field, washed them and iced them at the Montz facilities at his own expense and loaded them on the truck borrowed from his brother, Royal Gray, Ernest Gray testified as follows:
“Q. Now your deal on those vegetables, wasn’t it that you were to take them to New Orleans— A. Yes sir.
“Q.- — And sell them? A. Yes sir, I was selling them.
“Q. And whatever you got for selling them, you would give half of it to Mr. Montz. A. No, I pay him so much a dozen for them.
“Q. Are you sure of that? A. Yes.”
Almost immediately after that Gray testified :
“Q. Didn’t you bring half of what you got for that load of turnips back to Armand Montz ? A. I couldn’t bring half of it when I had to take my money out for my bunches. * * * I couldn’t bring back half of it; I have to take my money out for the bunches; I can’t give him half of it.
“Q. How much did you give him?' A. I give him about $25 or $30.00.
“Q. Well how did you determine the' $25 or $20.00. Did you tell him: ‘Here-is what I have after my expenses’?' A. That’s right.
“Q. It was half of what you had after your expenses; is that correct? A. That’s right, after my expenses.
******
“Q. Now Mr. Montz has this deal' with you doesn’t he? After you takeout these vegetables, and when you sell these vegetables you and he split the profit? Is that right? A. That’s, right.
# * * * *
“Q. Now on the day after this accident that you are being sued on now, didn’t you go back to Laplace and give Mr. Montz his share of the profits, from the turnips ? A. Yes.
“Q. You did? A. Yes.”
*281 Later in the trial Ernest Gray was placed on ■the stand by the attorney for appellants and testified in part as follows:
“A. I went to see Mr. Montz about a month before the stuff was ready. When the stuff was ready, he called me up and said the stuff would be ready •out there in a week, and the stuff was ready so I went and made an arrangement to haul it and pay him so much •a dozen for the stuff, just like I pay the buncher, and pay for the washer, and pay for the ice. I went there the next •day before the accident happened — I went and loaded the bunched vegetables up and taken them to the ice plant and washed them, and after finishing they was loaded up, and put ice on them and paid Mr. Montz for his ice, paid him for the washing, and came to New Orleans with the stuff. And I came to New Orleans, and I sold the stuff. After I sold the stuff, on my way back home I had the accident. But, after I had the accident I went to Mr. Montz and paid him so much a dozen, what I promised to pay him, I paid him the amount. If it was $29 I was supposed to pay him, I paid him the amount. If it was $29, I paid him $29. If it was '$15, I paid him the amount. That was "the bargain me and Mr. Montz made.
“Q. Was that the bargain you and Mr. Montz made on the day this accident happened? Was that the bargain in effect at the time? A. Yes, sir.
“Q. Ernest, do you remember how much you agreed to pay Mr. Montz for these particular vegetables you got on this particular day of this accident? A. It was 15^ a dozen, for twelve hunches.
“Q. 150 a dozen? A. One hundred dozen would be $15.
“Q. Do you remember how many you took? A. Well, I can’t remember how many it was I took, how many dozen I took, but I paid- — if I had bunched 100 dozen, I would pay him $15. That would $15 if I had went to the market and sold it for $3 or $4. What Mr. Montz was looking for was $15, no matter what I did with them.”
His cross-examination by plaintiff’s attorney elicited the fact that about six or seven months after the accident, he had made a statement to plaintiff’s attorney which the attorney had transcribed — the witness himself being unable to read and write but which he had signed, being able mechanically to sign his name.
The statement reads in part:
“At the time of the accident I was coming from the French Market where I had just delivered a truck load of vegetables. I had bought these vegetables from Armand Montz, Laplace, Louisiana * * * The deal is that Armand Montz loads up the truck the night before, and lets me go to New Orleans to sell it, and whatever I get for the truck-load of vegetables we split the profits. Like if I sell the load for $60.00, he gets $30.00 and I get $30.00, If I don’t sell the vegetables I bring them back to Mr. Montz and we throw them away.”
After the statement was read to the witnesses, he was asked whether his previous testimony and that statement were the same, and he answered:
“No, it is not the same.
“Q. Now which one of those statements is correct, Ernest ? A. The one with the attorney.
“Q. The signed statement is correct? A. Yes.”
On redirect he testified:
“Q. Would you tell this Jury again what arrangement you had' with Mr. Montz on this particular lot of vegetables on this particular day of this accident? A. The way when the accident? The day before I went to make the load. It was, I believe was on a Wednesday or a Tuesday I made *282 the load, I went in the field and hunched the vegetables. I had seen Mr. Montz that day ahead of time, about 100 dozen vegetables, and he said, ‘Well, I can sell them to you for 15$’. That day, after then I went in the field and bunched the stuff, came to the ice-house and loaded the stuff up. After I loaded it, I iced it, and then I left out with the truck that night around six o’clock. I came to the market the next day I made the accident. After I made the accident and I was giving my story to the cops, and then after that I went home, and went home. I had offered him 15$ a dozen.
* * * * * *
“Q. Did (Mr. Montz) ever tell you what to do with those vegetables ? A. No, he didn’t tell me what to do.
“Q. Did he ever tell you where to take your truck? A. No, if I wanted to take it to Detroit, Alabama, or anywhere, that was my business, or go dump them back of the levee.”
Then on further cross-examination, this witness testified:
“Q. Remember you are under oath now, and you are being asked whether you went and sold those vegetables down at the French Market, and brought Mr. Montz back half of the money you got from the vegetables? A. Yes.
“Q. That is what happened, wasn’t it ? A. That’s right, yes.
“Q. No further questions.”
It is thus seen that Ernest Gray frequently changed his testimony to a diametrically opposite position apparently depending upon whose attorney was doing the questioning. He veered with the wind. It is our considered opinion that he vacillated so much that his testimony is without any value whatever and could not validly form the basis for a judgment against Montz and his insurer.
What we have here is not a question of veracity between Montz and Gray. If it were, we would naturally be guided by the opinion of those who saw and heard the witnesses. What we have here is the fact that Gray’s testimony is without any probative value whatever.
Now there is a circumstance which might possibly have influenced the minds of the jurors and that is the fact, freely testified to by Montz, that he, for many years, had had arrangements with two other vegetable vendors whose operations in all respects, regarding the gathering, bunching, washing and icing the produce, was similar to Gray’s operations. Montz testified that these two others were on a “split-profit” basis and' were utilized by him in order to determine the prevailing French Market price, explaining that if he sold vegetables outright to a trucker at the farm he had no means, of determining the prices their resale might bring; whereas if he shared the trucker’s, profit, he would necessarily know the prices paid on the open market.
' At one point in his testimony, Ernest Gray was asked about these other vendors and replied that his own operations were just like theirs. Montz as we have seen, testified to the contrary.
It is conceded that Montz trusted Ernest Gray. For instance, he trusted Gray’s count of the bunches and even trusted him for days for payment of the price, well knowing that Gray was indigent and could not pay until he had resold the vegetables. No reason appears of record why Montz could not have carried Gray on the same profit-sharing basis as the two others.
The question is however, not what he could have done but what he did. Montz testified clearly and unequivocally. Gray’s testimony cannot be depended on for anything.
The question then resolves itself into whether the jury was justified in finding that there was a profit-sharing arrangement between Montz and Ernest Gray simply because Montz had a profit-sharing arrange *283 ment with two other vendors. We think not. It is our opinion that the record does not support the jury’s verdict.
For the reasons assigned the judgment appealed from is reversed insofar as it runs in favor of plaintiff and against Armand Montz and Massachusetts Bonding and Insurance Company and in all other respects the judgment is affirmed. Plaintiff is to pay the costs of this appeal.
Reversed in part.
Affirmed in part.